William MADELY and James Borland, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

RADIOSHACK CORPORATION, Defendant-Respondent.

Court of Appeals

*No. 2006AP2918. Submitted on briefs August 30, 2007. —Decided October 23, 2007.*

2007 WI App 244

(Also reported in 742 N.W.2d 559.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Robert K. O'Reilly* of *Ademi & O'Reilly, LLP*, of Cudahy.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Bernard J. Bobber* of *Foley & Lardner LLP*, of Milwaukee, and *Robert S. Brewer, Jr.* and *James S. McNeill* of *McKenna Long & Aldridge LLP* of San Diego, CA.

Before Brown, C.J., Curley, P.J., and Wedemeyer, J.

¶ 1. CURLEY, P.J. William Madely and James Borland appeal from a judgment dismissing their claims that they were improperly classified as exempt from overtime payments, denying their motion for partial summary judgment, and granting summary judgment to RadioShack. Madely and Borland argue that: (1) the trial court erred by weighing the evidence in RadioShack's favor where there were disputed questions of material fact; and (2) a trial is required because a jury could find that RadioShack Y[1] store managers do not exercise discretionary power and do not have the requisite authority regarding personnel matters.

¶ 2. We disagree and conclude that the trial court properly granted summary judgment pursuant to Wis. Stat. § 802.08(6) (2003–04) because the class of Y store managers were appropriately designated as falling within Wisconsin's executive exemption.[2] Accordingly, we affirm.

---

[1] RadioShack designates its stores as either Y stores or V stores. A Y store typically has annual sales of $500,000 or more in the previous year, and a V store has annual sales of less than $500,000 in the previous year. Y store managers do not receive overtime compensation, while V store managers do.

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

## I. BACKGROUND.

¶ 3.   Madely and Borland are former Y store managers for RadioShack. They claim, on behalf of a class consisting of Y store managers, that RadioShack violated Wisconsin's statutory overtime law by improperly classifying them as exempt employees under the Department of Workforce Development's exemption regulation found at WIS. ADMIN. CODE § DWD 274.04.[3]

¶ 4.   Madely and Borland filed a motion for partial summary judgment, arguing that RadioShack could not prove two of the six elements required to establish that the class members were exempt from Wisconsin's overtime regulations. Specifically, they argued that RadioShack could not meet its burden of showing that Y store managers have the requisite personnel authority to qualify for the executive exemption, in accordance with WIS. ADMIN. CODE § DWD 274.04(1)(a)3.; or that they "customarily and regularly exercise[] discretionary powers," pursuant to WIS. ADMIN. CODE § DWD 274.04(1)(a)4.

---

[3] Madely filed his complaint on December 6, 2002, alleging that RadioShack failed to pay he and other similarly situated RadioShack store managers overtime wages. Borland filed a similar complaint on February 10, 2003. The trial court subsequently consolidated the cases.

Borland sought class certification on behalf of two subclasses:  Y store managers, on grounds that RadioShack improperly classified them as exempt from overtime payment; and V store managers, on grounds that RadioShack failed to pay overtime for hours worked in excess of forty hours per week. The trial court granted certification for a class of Y store managers with Madely designated as class representative and Borland designated as a class member. The trial court denied certification of a class of V store managers.

All code provisions are current through Wisconsin Administrative Register No. 620, August 2007.

¶ 5. With respect to Wis. Admin. Code § DWD 274.04(1)(a)3., Madely and Borland provided numerous examples of situations where Y store managers lack authority to act on personnel issues. For example, Y store managers cannot make final hiring and firing decisions; rather, they conduct "prescreening reviews" of prospective employees and make recommendations as to terminations. Madely and Borland assert that the district sales manager is the person responsible for making personnel decisions, not the store manager, as the role of a store manager is that of lead salesperson. They argued that "RadioShack sales managers [i.e., Y store managers] clearly do not have the authority to hire or fire other employees, and their suggestions and recommendations about the hiring, firing, advancement or promotion or any other change of status of other employees are not given particular weight."

¶ 6. To support their position as to Wis. Admin. Code § DWD 274.04(1)(a)4., Madely and Borland relied, in large part, on RadioShack's Store Operations Manual (the Manual), which establishes mandatory policies. They contend that the all-encompassing Manual "dictates the policies and procedures down to the minutia of how their desk is organized, how to change light bulbs, how to resolve plumbing problems, telephone problems, roof leaks, and landlord issues, and how a sales manager should schedule his or her own hours." (Record citations omitted.) According to Madely and Borland, any discretion that is exercised in following the prescribed procedures is minimal and distinguishable from the actual exercise of discretion. In addition, Madely and Borland rely upon RadioShack's "Assistant Manager Training Program Instructor's Guide," which describes the company's "SEVEN-ONE-ONE" management method. This method directs store managers to

317

schedule "7 hours of selling, 1 hour on training, and 1 hour of paperwork each day." They argue that this shows that Y store managers are trained and instructed to spend the majority of their employment time as salespersons; therefore, they argued that "the most RadioShack can suggest is that sales managers *occasionally* exercise discretionary powers," which is insufficient to satisfy § DWD 274.04(1)(a)4.

¶ 7. In its opposition materials, RadioShack addressed each of the elements of Wisconsin's executive exemption to support its argument that Y store managers qualify. RadioShack then requested that the trial court deny Madely and Borland's motion for summary judgment and instead grant summary judgment in its favor, pursuant to WIS. STAT. § 802.08(6).

¶ 8. The trial court subsequently denied Madely and Borland's request for summary judgment, and concluded that RadioShack was entitled to partial summary judgment with respect to WIS. ADMIN. CODE § DWD 274.04(1)(a)2.-6. The trial court then took the issue of whether RadioShack was entitled to partial summary judgment pursuant to § DWD 274.04(1)(a)1. under advisement. It subsequently determined that RadioShack was entitled to summary judgment as to all of the elements set forth in § DWD 274.04(1)(a) and dismissed Madely and Borland's claims that they were improperly classified as exempt.[4] This appeal follows. Additional facts are provided in the remainder of the opinion as needed.

---

[4] The trial court took under advisement, for determination at a later date, whether Madely and Borland adequately pled a WIS. STAT. § ch. 109 claim separate from the claim that they were improperly classified by RadioShack as exempt from the overtime pay requirements. The parties later stipulated to the entry of summary judgment on the ch. 109 claim; consequently,

## II. Analysis.

¶ 9. "When reviewing a grant of summary judgment, appellate courts independently apply the same methodology as the trial court. That methodology has been set forth numerous times, and we need not repeat it here." *Fore Way Express, Inc. v. Bast*, 178 Wis. 2d 693, 701, 505 N.W.2d 408 (Ct. App. 1993) (citations omitted). We do, however, point out that a motion for summary judgment is not a motion free of adverse consequences, in that a court may grant a request for summary judgment when made by a party opposing another party's motion. *See* Wis. Stat. § 802.08(6) (allowing that summary judgment maybe be awarded in the opponent's favor, "[i]f it shall appear to the court that the party against whom a motion for summary judgment is asserted is entitled to a summary judgment").

¶ 10. Madely and Borland filed a motion for partial summary judgment, arguing that RadioShack could not meet its burden of showing that Y store managers have the requisite personnel authority to qualify for the executive exemption, in accordance with Wis. Admin. Code § DWD 274.04(1)(a)3.; or that they exercise discretionary powers, pursuant to Wis. Admin. Code § DWD 274.04(1)(a)4. A motion for summary judgment amounts to an " 'explicit assertion that the movant is satisfied that the facts are undisputed and that on those facts he is entitled to judgment as a matter of law.' " *Grotelueschen v. American Family Mut. Ins. Co.*, 171 Wis. 2d 437, 446, 492 N.W.2d 131 (1992) (citation omit-

Madely and Borland's complaint was dismissed in its entirety. Madely and Borland have not raised issues pertaining to a ch. 109 claim on appeal.

ted); *see also Fore Way*, 178 Wis. 2d at 702. So long as "only one reasonable inference can be drawn from those undisputed facts as a matter of law, reciprocal motions for summary judgment waive the right to a jury trial." *Grotelueschen*, 171 Wis. 2d at 447.

¶ 11.  On appeal, Madely and Borland now contend that "[b]oth parties here have submitted facts that would allow a jury to decide this action either way, and different inferences may be drawn from those facts." We disagree and conclude that only one reasonable inference can be drawn as to WIS. ADMIN. CODE § DWD 274.04(1)(a)3. and 4. *See generally Burbank Grease Servs., LLC v. Sokolowski*, 2005 WI App 28, ¶ 10, 278 Wis. 2d 698, 693 N.W.2d 89, *rev'd in part on other grounds*, 2006 WI 103, 294 Wis. 2d 274, 717 N.W.2d 781 ("Whether an inference is reasonable and whether more than one reasonable inference may be drawn are questions of law."). Thus, as explained below, we reject as waived any challenges raised by Madely and Borland on appeal concerning what they now allege are disputed material facts entitling them to a jury trial as to § DWD 274.04(1)(a)3. and 4. By filing their motion for partial summary judgment, Madely and Borland conceded that the material facts as to §§ DWD 274.04(1)(a)3. and 4. were undisputed.[5] *See Grotelueschen*, 171 Wis. 2d at 446 ("A motion for summary judgment carries with it

---

[5] When they filed their motion for partial summary judgment, Madely and Borland represented to the trial court that their submissions in support of their motion "establish[ed] the absence of any genuine dispute regarding the relevant facts." However, in their appellate brief, they now state: "Genuine disputed issues of material fact exist as to whether 'Y' store sales managers customarily and regularly exercise discretionary powers [and] whether Y-store managers have the requisite personnel authority . . . ."

the explicit assertion that the movant is satisfied that the facts are undisputed and that on those facts he is entitled to judgment as a matter of law." (citation and quotation marks omitted)). When RadioShack filed a reciprocal motion for summary judgment addressing §§ DWD 274.04(1)(a)3. and 4. (along with the other elements), Madely and Borland's right to a jury trial was waived given our conclusion that only one reasonable inference can be drawn as to those facts. *See Grotelueschen*, 171 Wis. 2d at 447 (concluding that "when only one reasonable inference can be drawn from those undisputed facts as a matter of law, reciprocal motions for summary judgment waive the right to a jury trial").

■

¶ 12.   Notwithstanding the waiver of Madely and Borland's arguments as to Wis. Admin. Code § DWD 274.04(1)(a)3. and 4., further analysis is required as to the other elements of Wisconsin's executive exemption. *See* § DWD 274.04(1)(a). Our determination of whether RadioShack's Y store managers qualify for the executive exemption "involves interpretation and application of statutes and regulations to undisputed facts, which is a question of law appropriate for summary judgment." *Fore Way*, 178 Wis. 2d at 701.

*Wisconsin's Executive Exemption*

¶ 13.   This state requires employers to pay nonexempt employees "time and one-half the regular rate of pay for all hours worked in excess of 40 hours per week." Wis. Admin. Code § DWD 274.03. Exemptions to the overtime payment rule, one of which is the executive exemption, are detailed in Wis. Admin. Code § DWD 274.04. Section DWD 274.04 provides in pertinent part:

> [E]ach employer subject to ch. DWD 274 shall be exempt
> from the overtime pay requirements in s. DWD 274.03

and these exemptions shall be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations as amended, relating to the application of that act to all issues of overtime in respect to the following employees:

**(1)** Persons whose primary duty consists of administrative, executive or professional work.

(a) "Executive" means an employee employed in a bona fide executive capacity who meets the following criteria:

1. Whose primary duty consists of the management of the enterprise in which they are employed or of a customarily recognized department of subdivision thereof; and

2. Who customarily and regularly directs the work of 2 or more other employees therein; and

3. Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

4. Who customarily and regularly exercises discretionary powers; and

5. Who does not devote more than 20%, or in the case of an employee of a retail or service establishment who does not devote as much as 40%, of their hours of work in the workweek of activities which are not directly and closely related to the performance of the work described in subds. 1. through 4. provided, that this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20% interest in the enterprise in which he is employed; and

322

6. Who is compensated for their services on a salary basis at a rate of not less than $700 per month.

Because Wisconsin's administrative regulations are to be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act (FLSA) and the Code of Federal Regulations, we look to federal cases discussing the FLSA and the corresponding federal regulations to assist in our analysis.[6] *Id.*; *see* 29 U.S.C. §§ 201–219.

*A. The only reasonable inference that can be drawn is that Y store managers influence hiring, firing, and other personnel matters.*

¶ 14. WISCONSIN ADMIN. CODE § DWD 274.04(1)(a)3. requires that to qualify for executive exemption, the employee must be someone who "has the authority to

---

[6] Wisconsin did not adopt the August 2004 amendments to the federal exemption regulations. All references to the Code of Federal Regulations are to the 2003 versions.

We agree with RadioShack that Madely and Borland's argument that the federal decisions employing the short test are inapposite is unsupported and contrary to the express language of WIS. ADMIN. CODE § DWD 274.04, which provides that the executive exemption "shall be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations as amended . . . ." We observe that Wisconsin's administrative regulations do not include the short test (i.e., the federal regulations establish two different legal tests—a short test and a long test—based on salary level, *see Donovan v. Burger King Corp.*, 675 F.2d 516, 518 (2nd Cir. 1982) (*Burger King II*)); however, in all other regards, Wisconsin's administrative regulation regarding the executive exemption generally mirrors the executive exemption in the federal regulations. Consequently, federal cases are instructive for purposes of our analysis.

hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight." Madely and Borland argue that a jury could reasonably find that RadioShack's Y store managers do not have requisite input into RadioShack's hiring, firing, and other personnel matters. They assert that:

> Sales managers *cannot* hire employees. Sales managers are *limited* to conducting a "prescreening review" of potential employees and are instructed to refer potential employees to an employment open house. Sales Managers *cannot* terminate any employees. They *cannot* choose which RadioShack employees will work at their stores, even if the sales manager recruited the employee. They *cannot* determine how many employees they should have at the store. They *cannot* establish pay rates, give raises, or elect to pay bonuses to associates . . . .

> Sales managers *cannot* approve vacation time. They *must* hold Saturday morning meetings with the other employees at the store, and use the meeting guides prepared by RadioShack corporate headquarters. A computerized store scheduler ("RSS Scheduler") establishes the number of employees to be working at a particular time; sales managers *cannot* change the schedule without permission from their District Manager . . . .

(Record citations omitted; emphasis added.)[7]

¶ 15.   In their effort to emphasize the areas that Y store managers cannot influence or when they have

---

[7] Numerous record citations in Madely and Borland's brief do not match the record documents referenced, in violation of WIS. STAT. RULE 809.19(1) (2005–06). We remind counsel that we have no duty to scour the record to review arguments unaccompanied by adequate record citations. *See Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990).

only limited influence, Madely and Borland gloss over the areas where Y store managers have significant input. This is borne out in Madely and Borland's deposition testimony, which reflects numerous instances where the two recommended personnel changes and the subsequent result was evidence that their recommendations were given weight. For example, Madely testified to making recommendations for the termination of RadioShack employees on approximately five or six occasions, and in all but one instance, the employee in question was terminated. According to Madely, the one instance where his recommendation was not followed was due to a staffing shortage. Borland testified at his deposition:

[Question:] Did you have the same number of sales associates in that store at the time you left it as when you began?

[Borland's Answer:] No. I think we had one less, as I recall. I cleaned house after I took over, for various reasons.

We had serious personnel issues to deal with when I took over. And I think, of the people that I acquired, none were with me at the end. I acquired a whole new staff.

[Question:] What do you mean when you say you "cleaned house" when you took over?

[Borland's Answer:] For one reason or another, every employee was not appropriate for my expectations nor the company's.

[Question:] Do you mean you fired people?

[Borland's Answer:] I cannot fire them. I can only recommend.

[Question:] And did you recommend that those individuals, when you said you had serious personnel issues, be terminated?

325

[Borland's Answer:] In two cases – Let me think about that for a minute. In one case, yes.

¶ 16.   In addition, the record reflects that Borland and Madely also had input as to the advancement and promotion and other status changes of RadioShack employees working under them. *See* Wis. Admin. Code § DWD 274.04(1)(a)3. Borland testified at his deposition that store managers such as himself would have to recommend people for other positions, such as for entrance in RadioShack's manager training program. Madely also recommended that employees enter the manager training program, and those individuals subsequently were elevated.

¶ 17.   Madely and Borland now attempt to explain this evidence away by contending that it "suggests mere correlation, not a cause and effect relationship." We are not persuaded by Madely and Borland's attempt to chalk these facts up to "anecdotal evidence that sometimes, perhaps even frequently, the ultimate personnel decision reflects the recommendation of the sales manager."

¶ 18.   Section 541.106 of title 29 of the Code of Federal Regulations describes what is meant by the "authority to hire or fire." It provides as follows:

> Section 541.1 [governing the federal executive exemption] requires that an exempt executive employee have the authority to hire or fire other employees *or that his suggestions and recommendations as to hiring or firing and as to advancement and promotion or any other change of status of the employees who he supervises will be given particular weight.* Thus, no employee, whether high or low in the hierarchy of management, can be considered as employed in a bona fide executive capacity unless he is directly concerned either with the hiring or the firing and other change of status of the employ-

> ees under his supervision, whether by direct action *or by recommendation to those to who the hiring and firing functions are delegated.*

*Id.* (emphasis added). It is of no consequence that ultimately a district manager was the one to terminate an employee, because we are convinced that Madely and Borland were "directly concerned either with the hiring or the firing and other change of status of the employees under [their] supervision, . . . *by recommendation to those to who the hiring and firing functions are delegated." Id.* (emphasis added); *cf. Marshall-Wells Co. v. Hawley*, 53 F. Supp. 295, 298 (D. Minn. 1942) (finding that evidence of an employee's recommendation was followed "is direct and convincing evidence that his recommendation was given particular weight . . . . The [FLSA] does not require that, in order to be an executive, he must have the right to make the controlling recommendation as to the status of his employees").

■

¶ 19.   With this in mind, we conclude that the only reasonable inference from the evidence is that RadioShack Y store managers are individuals "whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight," in accordance with Wis. Admin. Code § DWD 274.04(1)(a)3.

*B.   The only reasonable inference that can be drawn is that Y store managers "customarily and regularly exercise[] discretionary powers."*

¶ 20.   To support their contention that a jury could reasonably find that Y store managers lack the ability to exercise discretionary powers, *see* Wis. Admin.

CODE § DWD 274.04(1)(a)4., Madely and Borland argue that RadioShack's corporate policy, which sets forth prescribed procedures for basically any scenario, dictates virtually all of the Y store managers' decisions. Specifically, they contend that "[m]inimal discretion in following a prescribed procedure cannot be equated with the exercise of discretionary powers." However, the fact that RadioShack has "mandatory" procedures in place does not necessarily lead to the conclusion that Y store managers do not routinely exercise discretionary powers. *Cf. Donovan v. Burger King Corp.*, 675 F.2d 516, 519 (2nd Cir. 1982) (*Burger King II*) (noting with respect to Burger King's reliance on its express written policy, that "[t]he record supports the finding as to Burger King's actual practices, in contrast to its public declarations").

¶ 21. WISCONSIN ADMIN. CODE § DWD 274.04(1)(a)4. requires that in order to qualify for the executive exemption, an employee must "customarily and regularly exercise[] discretionary powers." The applicable federal regulation interprets this requirement as follows:

> A person whose work is so completely routinized that he has no discretion does not qualify for exemption.
>
> (b) The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties. The requirement is not met by the occasional exercise of discretionary powers.

29 C.F.R § 541.107.

328

¶ 22. According to Madely and Borland, courts interpreting the executive exemption apply the definition from the regulations governing the federal administrative exemption. The federal administrative exemption requires that the employee "customarily and regularly exercise[] discretion and *independent judgment*," *see* 29 C.F.R § 541.2(b) (emphasis added), whereas the federal executive exemption (like Wisconsin's executive exemption) requires that the employee "customarily and regularly exercise[] discretionary powers," *see* 29 C.F.R § 541.1(d). Madely and Borland do not cite any case law where courts have interpreted the executive exemption by applying the definition of "discretion and independent judgment" found in the administrative exemption.[8] Consequently,

---

[8] We have not been presented with any legal authority that could even arguably support Madely and Borland's argument that "courts interpreting the executive exemption, apply the definition from the regulations governing the administrative exemption." Madely and Borland's reliance on *Kemp v. Montana Bd. of Pers. Appeals*, 989 P.2d 317 (Mont. 1999), and *Nordquist v. McGraw-Hill Broad., Co.*, 38 Cal. Rptr. 2d 221 (Cal. Ct. App. 1995), is wholly misplaced. In *Kemp*, the court referenced an employee's testimony that she exercised independent judgment as to the operation of the kitchen where she worked. *Id.*, 989 P.2d at 321. However, the court's discussion in this regard related to its analysis of 29 C.F.R. § 541.103, and in no way incorporated, referenced, or implicated the administrative exemption as Madely and Borland seem to contend. In *Nordquist*, the court discussed California's professional employee exemption and its administrative employee exemption, which differ from the FLSA's exemptions. *Id.*, 38 Cal. Rptr. 2d at 225. The court made no mention as to the relationship between the executive exemption and the administrative exemption, and, as such, *Nordquist* is irrelevant to the issue at hand. Likewise, Madely and Borland's reference to the U.S. Department of Labor Wage and Hour Division's opinion letter concluding that

we are not persuaded by their argument and conclude that their discussion of the administrative exemption in this context is not relevant to our determination here.

¶ 23.   Likewise, Madely and Borland's citation to *Secretary of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784 (1st Cir. 1985), *questioned on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), is of no assistance to their position. They contend that in this case, the court "held that a retail store manager who supervised two full-time employees no more than 76% of the time did not engage in customary and regular supervision, and therefore, the store manager was not exempt." From this, they extrapolate, "given that RadioShack sales managers spend all or virtually all of their time engaged in personal selling, or performing administrative or managerial tasks pursuant to the Store Operating Manual, the most RadioShack can suggest is that sales managers *occasionally* exercise discretionary powers"—which they argue is insufficient to satisfy Wis. Admin. Code § DWD 274.04(1)(a)4.

¶ 24.   Our review of *Daylight Dairy* does not lead to the same conclusion. We fail to see how that court's discussion pertaining to the federal executive exemption

loan officers would not be exempt as administrative employees is inapposite. U.S. DOL, Op. Ltr., 2001 WL 1558764 (Feb. 16, 2001).

Lastly, we do not follow the logic of Madely and Borland's one-sentence statement in their reply brief that "RadioShack's misinterpretation of the executive exemption is so common that it is specifically proscribed in the regulations," coupled with their citation to 29 C.F.R. § 541.207(c), which elaborates on the administrative exemption's "discretion and independent judgment" requirement. No additional analysis is provided. As it stands, this argument is undeveloped, and we need not consider it. *See generally M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988) (we need not consider undeveloped arguments).

requirement that an employee must customarily and regularly direct the work of two or more other employees, *see* 29 C.F.R. §§ 541.1(b), 541.105(a)—an element of the executive exemption that is not at issue in this appeal, *see* WIS. ADMIN. CODE § DWD 274.04(1)(a)2.; *supra* n.9—is relevant to our determination of whether RadioShack Y store managers "customarily and regularly exercise[] discretionary powers," pursuant to § DWD 274.04(1)(a)4. *See Daylight Dairy*, 779 F.2d at 787–88. We agree with RadioShack that the extent of supervision of subordinate employees is not a corollary to the exercise of discretionary powers; Madely and Borland have not presented any legal authority to the contrary.

¶ 25. Moreover, in providing numerous examples of all the different situations where RadioShack's policies and procedures limit their ability to act, Madely and Borland overlook the fact that discretionary determinations must be made on a number of fronts in carrying out the mandates of the policies and procedures. In this regard, we agree with the trial court's reasoning that although the Manual was detailed, Y store managers were still regularly required to exercise their discretion in complying with it. *See Bass v. Ambrosius*, 185 Wis. 2d 879, 883 n.3, 520 N.W.2d 625 (Ct. App. 1994) (noting that although "review is *de novo,* the rationale underlying a trial court's decision on summary judgment is often extremely helpful to our analysis"). The trial court explained:

> If somebody is a minute late, do you take action? Five minutes late, 10 minutes late? When does it become important enough? If you're two minutes late but you do it day after day, is that important enough? That's a matter of discretion and there seems to be no question that the manager would have to decide:   Is it important enough to do anything about? If it is, what do I do? Do I scold them and see what happens? Do I do

a written report? Do I call my supervisor and discuss it with him? When does it become a problem that's big enough to take certain action? When does it become enough of a problem to ask that the employee be terminated? Those are all discretionary decisions that are of high significance in terms of the running of a store. I don't think it should be necessary to go on. I think there are just lots of examples.

¶ 26. The record supports the inference that Y store managers exercised their discretion on a daily basis. RadioShack provides a plethora of examples of this exercise, which include critiquing and commenting on employee performance; taking corrective measures to address safety issues present in the store; training employees on sales techniques; providing employees with monthly reviews; delegating tasks; assigning sales goals; etcetera. Thus, we conclude that the only reasonable inference from the evidence is that RadioShack Y store managers are individuals who "customarily and regularly exercise[] discretionary powers," in accordance with WIS. ADMIN. CODE § DWD 274.04(1)(a)4. Accordingly, Madely and Borland waived their right to a jury trial as to § DWD 274.04(1)(a)3. and 4. when they filed their motion for partial summary judgment. *See Grotelueschen*, 171 Wis. 2d at 447.

¶ 27. In light of the waiver of WIS. ADMIN. CODE § DWD 274.04(1)(a)3. and 4.; Madely and Borland's undeveloped argument as to § DWD 274.04(1)(a)5.; and the fact that § DWD 274.04(1)(a)2. and 6. are not disputed on appeal; the only remaining issue for our review is whether there is a genuine issue of material fact as to § DWD 274.04(1)(a)1.[9]

---

[9] Madely and Borland argue that there are questions of material fact that preclude summary judgment on whether Y store managers were in "sole charge" of their stores, pursuant to

## C. A Y store manager's primary duty is management.

¶ 28. Madely and Borland argue that summary judgment is inappropriate because there is an issue of fact as to whether the primary duty of Y store managers was management or whether the primary duty of Y store managers was sales. Specifically, they claim to have provided significant evidence that the primary duty of a Y store manager was sales and that any management tasks that were performed were minor and dictated by the Manual. They emphasize RadioShack's policies, specifically the 7–1-1 management method, which calls for seven hours out of a Y store manager's nine-hour day to be spent selling. According to Madely and Borland, "the Store Managers' primary duty was sales, and any management tasks were incidental, minor and dictated by [the Manual]." We disagree.

WIS. ADMIN. CODE § DWD 274.04(1)(a)5., and they take issue with RadioShack's reliance on *Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991). RadioShack responds by asserting that "it is undisputed that Madely, Borland, and the class of Y Store Managers were the highest ranking supervisory employees at their store locations on a day-to-day basis," and contends that no further showing was required pursuant to 29 C.F.R. § 541.113(d). Madely and Borland neglected to offer any argument in their reply brief on this issue. We deem this omission a concession. *See generally Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 109, ¶ 4, 293 Wis. 2d 668, 721 N.W.2d 127, *review granted*, 2007 WI 16, 298 Wis. 2d 94, 727 N.W.2d 34 (concluding that cross-appeal issues were conceded when party failed to respond in their reply brief to the cross-respondent's argument). We therefore do not address this issue any further.

Madely and Borland have not raised any appellate issues as to the trial court's conclusion that WIS. ADMIN. CODE § DWD 274.04(1)(a)2. and 6. were satisfied.

¶ 29. Just as the existence of detailed company policies and procedures did not necessarily lead to the conclusion that Y store managers do not regularly exercise discretionary power, in this context, the existence of detailed company policies and procedures does not automatically result in a finding that a Y store manager's primary duty is not management. *See Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (*Burger King I*) ("The fact that Burger King has well-defined policies, and that tasks are spelled out in great detail, is insufficient to negate [the] conclusion [that the supervision of other employees is clearly a management duty]."). Rather, "[a] determination of whether an employee has management as his primary duty must be based on all the facts in a particular case." 29 C.F.R. § 541.103; *see Ale v.* Tennessee Valley Auth., 269 F.3d 680, 688–89 (6th Cir. 2001) (explaining "that courts must focus on the actual activities of the employee in order [to] determine whether or not he is exempt from the FLSA's overtime regulations").

¶ 30. The primary duty element of Wisconsin's executive exemption mirrors the primary duty element of the federal executive exemption. In this regard, 29 C.F.R. 541.1 provides that an employee employed in a *bona fide* executive capacity means an employee: (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of subdivision thereof. Similarly, the primary duty element of Wis. Admin. Code § DWD 274.04 provides that an employee employed in a *bona fide* executive capacity means an employee: "1. Whose primary duty consists of the management of the enterprise in which they are employed or of a customarily recognized department of subdivision thereof."

¶ 31. While courts may consider the overall time the employee spends on managerial tasks in determining whether an employee has management as his primary duty, this is not the sole test. 29 C.F.R. § 541.103. The applicable federal regulation provides:

> [I]n situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. *Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.* For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty.

*Id.* (emphasis added). It has been held that "[t]his example [found in § 541.103] makes it quite clear that an employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management." *Burger King I*, 672 F.2d at 226.

¶ 32. In *Burger King I*, the court was asked to determine whether Burger King assistant managers qualified for the executive exemption, such that they

were not entitled to overtime pay under the FLSA. *Id.* at 223. To make this determination, the First Circuit Court of Appeals analyzed whether the assistant managers had management as their primary duty, and in doing so, the court endorsed "the proposition that the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions." *Id.* at 225–27. The court concluded that because the trial court found that the assistant managers were "in charge" of the restaurants during their shifts, the trial court's finding that they did not have management as their primary duty was in error. *Id.* at 227. The *Burger King I* court noted that many of the assistant manager's tasks were "governed by highly detailed, step-by-step instructions contained in Burger King's 'Manual of Operating Data,' and admit little or no variation." *Id.* at 223. Yet, this did not preclude it from concluding that the primary duty element was satisfied.[10]

¶ 33.  The *Burger King II* court, addressing identical issues as the court in *Burger King I, see Burger King II*, 675 F.2d at 522 n.6, acknowledged:

> We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different loca-

---

[10] In *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982) (*Burger King I*), the court analyzed the primary duty element for assistant managers qualifying for application of the federal short test; however, the court noted that "[i]n so far as long test personnel must also have management as a primary duty, our ruling here that that requirement was met applies equally to them." *Id.* at 225 n.6. Consequently, as noted *supra* n.6, the *Burger King I* court's primary duty analysis is pertinent for our purposes as well.

tions and that adherence by Assistant Managers to a remarkably detailed routine is critical to commercial success. The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to "the book." Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, *but judgments must still be made.* In the competitive, low margin circumstances of this business, the wrong number of employees, too many or too few supplies on hand, delays in service, the preparation of food which must be thrown away, or an underdirected or undersupervised work force all can make the difference between commercial success and failure.

*Id.* at 521–22 (emphasis added). The court went on to affirm the trial court's findings that the primary duty element was satisfied as to a subset of Burger King's assistant managers and that they were accordingly exempt based on its conclusion that their primary duty consisted of managerial responsibilities. *Id.* at 522.

¶ 34. As previously described in our discussion of Wis. Admin. Code § DWD 274.04(1)(a)4., Y store managers regularly exercise discretionary powers in carrying out RadioShack's prescribed policies and procedures, much like the assistant managers in *Burger King II* exercised discretion in carrying out Burger King's detailed guidelines. *Id.*, 675 F.2d at 521–22. Furthermore, RadioShack presented a number of facts reflecting that Y store managers were "in charge" of their RadioShack stores on a daily basis and were relatively free from supervision. *Burger King I*, 672 F.2d at 225–27. For instance, Madely was questioned at his deposition:

> [Question:] And, as far as the day-to-day management of the store, were you the person in charge?

> [Madely's Answer:] Yes.

337

[Question:] How often did you interact with your district manager when you were a Y Store manager?

[Madely's Answer:] Once a month and any time that he called.

[Question:] And how often was that, usually?

[Madely's Answer:] Maybe once a week.

[Question:] The once-a-month meetings would typically last for how long?

[Madely's Answer:] Five, six hours.

[Question:] And those would be held at the district office?

[Madely's Answer:] Correct.

[Question:] And the once-per-week phone calls, how long would those usually last?

[Madely's Answer:] Maybe five minutes.

[Question:] How often would the district manager visit your store when you were a Y Store manager?

[Question:] Once every couple months.

Similarly, Borland testified at his deposition that although the district manager was supposed to visit his store once a month, often times that was not the case; sometimes the district manager would visit twice in one month and other times there would be a three-month lapse before the district manager would come to the store. His individual telephone calls with the district manager typically lasted two to three minutes. Lastly, it is undisputed that there was a significant salary differential between what Madely and Borland earned in their

338

capacity as Y store managers and what the sales associates earned.[11]

¶ 35. Thus, similar to the conclusions reached by the courts in *Burger King I* and *Burger King II*, we conclude that the primary duty element was satisfied as to RadioShack's Y store managers. While we acknowledge that selling was a major component of a Y store manager's responsibilities, this does not negate the conclusion that while he or she is selling, a Y store manager is also managing the store. See *Burger King I*, 672 F.2d at 226 (an employee's primary duty can be management even while that employee is performing other work).

¶ 36. For the foregoing reasons, we affirm the trial court's grant of summary judgment based on our conclusion that RadioShack's Y store managers were properly classified as qualifying for Wisconsin's executive exemption. The trial court did not improperly weigh the evidence, as Madely and Borland contend; rather, it simply decided the issues as a matter of law.

*By the Court.*—Judgment affirmed.

---

[11] Madely stated at his deposition that he earned between $40,000 and $43,000 per year as a Y store manager during the class period, while full-time sales associates working under him earned approximately $350 every two weeks (i.e., just over $9000 per year). Borland testified that he earned approximately $42,000 in 2001, with the average sales associate below him generally earning from one-third to one-half of what he was making.